## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK PROTON CENTER,
225 East 126th Street,
New York, NY 10035

DEBORAH HEINEMAN,
368 West 117 Street,
New York, NY 10026

VIRGINIA L. LYNCH,
18 Creek Road #602,
Huntington, NY 11743

and

ROBERT PETERSEN,
180 Glenbrook Rd., Unit #31,
Stamford, CT 06902

Civil Action No.: 1:25-cv-4547

*Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue, SW
Washington, DC 20201

*Defendant*.

## <u>COMPLAINT</u>

The New York Proton Center (NYPC) and individual patients and Medicare beneficiaries

Deborah Heineman, Virginia L. Lynch, and Robert Petersen bring this action against Robert F.

Kennedy—in his official capacity as Secretary of Health and Human Services—to obtain review

under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 - 706, of two groups of Medicare

payment determinations for proton beam therapy (PBT) furnished by NYPC in Manhattan.

The Centers for Medicare & Medicaid Services (CMS) of the U.S. Department of Health & Human Services (HHS) administers the Medicare program for the Secretary. CMS determined the rates paid to NYPC for PBT. Those rates are patently unfair; they do not cover the costs of providing PBT services to Medicare beneficiaries with cancer and are lower than the Medicare rates for PBT services furnished just across the Hudson River, in New Jersey.

Equally important, the Medicare payment determinations violate the APA because National Government Services, Inc. (NGS), the Medicare Administrative Contractor (MAC) for New York State, determined the rates for CMS using a methodology that was not authorized by Congress, adopted through notice-and-comment rulemaking, or even contemplated in sub-regulatory guidance. The statutory methodology for determining the rates requires the establishment and use of resource-based, national relative value units (RVUs) for the services. CMS departed from the statute by issuing sub-regulatory guidance that instructed NGS to determine the RVUs for PBT by locality. NGS then departed from the sub-regulatory guidance by using its own *ad hoc* methodology to determine the rates for PBT in Manhattan. Namely, it took local RVUs that were established using costs to provide PBT in Warrenville, Illinois, made some adjustments to the local Warrenville, Illinois RVUs for locality, and applied the results to Manhattan. Both the *ad hoc* NGS methodology and the CMS sub-regulatory methodology were contrary to the statute or, alternatively, had to be promulgated through notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2) before they could become effective.

The Medicare payment determinations also violate the APA because the rates are facially arbitrary and capricious. NYPC delivers innovative, high-value PBT that saves both lives and money. It is the only PBT provider to obtain the extensive regulatory approvals required to furnish PBT in New York State. And it serves the statewide Medicare population from Manhattan, the

most densely populated and expensive locality in the country. What reason could possibly justify paying less for PBT in Manhattan than in New Jersey?  Absolutely none.

The first group of Medicare payment determinations span 1,078 claims for PBT rendered between October 7, 2021, and June 13, 2022—including the claims for PBT rendered to Ms. Heineman, Mrs. Lynch, and Mr. Petersen—that were underpaid by more than $1 million. NYPC sought a redetermination of the Medicare payment determinations, which NGS denied. NYPC sought a reconsideration of the denial through the Qualified Independent Contractor (QIC), which the QIC dismissed. NYPC then requested a review of the dismissal by an administrative law judge (ALJ), who affirmed. The ALJ then denied a motion by NYPC to vacate the dismissal.

The ALJ affirmed the dismissal by the QIC on the legal ground that the Medicare payment determinations were unreviewable. That is, the ALJ found that neither the ALJ, nor the Medicare Appeals Council within HHS, nor the Secretary, nor this Court may look at the administrative record, confirm what is obvious, and reach a legally correct and economically rational outcome that serves the interests of Plaintiffs and all Medicare beneficiaries in the tri-state area who need PBT.  The denial of the motion to vacate the dismissal left all Plaintiffs without an avenue for further administrative review of the first group of Medicare payment determinations.

The second group of Medicare payment determinations span subsequent claims for PBT that were underpaid by $883,429.19. NYPC sought a redetermination of these Medicare payment determinations, which was unfavorable. NYPC then sought a reconsideration, which was unfavorable. NYPC then requested an ALJ hearing, which was dismissed. NYPC then filed requests to vacate the dismissal with the ALJ and the Council. The Council dismissed the request to the Council on the legal ground that it was untimely and declared that "[t]he ALJ's action is binding[,]" despite the pending request to the ALJ for a vacatur of the dismissal.

This Court should vacate and set aside the Medicare payment determinations under the APA, 5 U.S.C. §§ 706(2)(A), (C), (D), and (E). The Court should also vacate and set aside the NGS and CMS methodologies under 5 U.S.C. §§ 706(A), (C), and (D). The Court should then remand to the Secretary with instructions to redetermine the Medicare payments.

## THE PARTIES

1.    NYPC is a New York State not-for-profit corporation. It has its principal place of business in New York, New York; NYPC furnishes PBT at 225 East 126th Street, New York, NY 10035. At all times relevant to this Complaint, NYPC participated in the Medicare program as a supplier of services.

2.    Deborah Heineman is a Medicare beneficiary who resides at 368 West 117 Street, New York, NY 10026. She received PBT from NYPC in Manhattan. NYPC challenged the Medicare payment determinations on her claims for PBT through the administrative appeal process. Ms. Heineman now joins NYPC in seeking judicial review of the first group of Medicare payment determinations.

3.    Virginia L. Lynch is a Medicare beneficiary who resides at 18 Creek Road #602, Huntington, NY 11743. She received PBT from NYPC in Manhattan. NYPC challenged the Medicare payment determinations on her claims for PBT through the administrative appeal process. Ms. Lynch now joins NYPC in seeking judicial review of the first group of Medicare payment determinations.

4.    Robert Petersen is a Medicare beneficiary who resides at 180 Glenbrook Rd., Unit #31, Stamford, CT 06902. He received PBT from NYPC in Manhattan. NYPC challenged the Medicare payment determinations on his claims for PBT through the administrative appeal process. Mr.

Petersen now joins NYPC in seeking judicial review of the first group of Medicare payment determinations.

5.  Defendant Robert F. Kennedy is the HHS Secretary and is sued in his official capacity only.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over Plaintiffs' claims for judicial review of the first group of Medicare payment determinations under 28 U.S.C. § 1331.

7.  This Court has subject matter jurisdiction over NYPC's claims for judicial review of the second group of Medicare payment determinations under 42 U.S.C. §§ 405(g) and (h). Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

8.  Venue is proper in this district under 28 U.S.C. § 1391(e) because the HHS Secretary resides in this district. In addition, as explained below, a substantial part of the events giving rise to Plaintiffs' action occurred in this district.

## FACTUAL AND LEGAL BACKGROUND

### *NYPC furnishes high-value PBT to cancer patients in Manhattan*

9.  PBT is an advanced radiation treatment that uses proton beams to target and deliver radiation to tumors. One of the main benefits of PBT is its precision—PBT can deliver a precise dose of radiation to tumors near vital organs.

10. NYPC has unique capabilities relative to other PBT centers.

11. NYPC is only the fifth multi-room PBT center in the United States with second-generation pencil beam scanning (PBS) capabilities in all treatment rooms. PBS is a sophisticated type of PBT which delivers intensity-modulated proton therapy through an extremely narrow beam, thus allowing for improved radiation dose coverage to target areas, while also significantly

reducing irradiation doses to adjacent healthy tissues. This can lead to fewer toxicities and better preservation of quality of life for patients.

12. Even among the limited number of centers with PBS capabilities, the small spot size—that is, the width of the beam—at NYPC is the industry leader. This allows NYPC to treat more complex tumors with a higher level of safety and precision than other PBT centers.

13. NYPC is also one of only five multi-room proton centers in the United States to have cone-beam computed tomography (CBCT) capabilities in all treatment rooms. CBCT scans, as opposed to conventional CT scans, allow for three-dimensional, direct visualization of tumors. Most other PBT centers rely on bony anatomy as a surrogate for tumor location. With direct visualization of tumors through CBCT technology, patients treated at NYPC can have smaller target volumes that can lead to fewer treatment-related side effects.

14. The field size upper limit at NYPC is the largest in the industry. Through PBS, NYPC can mirror the shape of the tumor, and a larger field size upper limit enables NYPC to treat larger and more complex tumors that can be difficult for other PBT centers to treat.

15. Additionally, NYPC utilizes robotic couches for exact placement and sophisticated imaging and treatment planning options.

16. NYPC's unique capabilities make it the best option for treatment for patients with complex tumors. NYPC delivers tremendous value in complex cases by successfully treating tumors with fewer treatment-related side effects, which enables third-party payers and patients to avoid the costs of care and diminished quality of life associated with the side effects.

17. The recognition that NYPC has received from the State of New York and the partnerships that NYPC has with leading academic medical centers are a testament to the value that it delivers through innovative technologies and clinical care. NYPC was first selected by the

New York State Commissioner of Health (Commissioner) to participate as the single PBT center in a 10-year, statewide demonstration project "to evaluate the medical efficacy, cost-effectiveness, efficiency of, and public need for, new medical technologies." *See Announcement: Medical Technology Demonstration Project Proton Beam Therapy*, Department of Health (May 5, 2010). After the demonstration project, the Commissioner found that NYPC met an identifiable need, was cost-effective and efficient, and met generally accepted medical standards for safety and effectiveness and accordingly granted NYPC's Certificate of Need (CON) application. NYPC is the only licensed PBT center in the State of New York, which has indicated that NYPC will retain that status at least through 2029.

18. Today, NYPC is partnered with leading academic medical centers Memorial Sloan Kettering Cancer Center, Montefiore Health System, and Mount Sinai Health System, and is working with them to make PBT accessible to patients in New York and throughout the region.

### *Medicare Part B pays for PBT because it is reasonable and necessary*

19. Medicare is the federal program that provides health coverage for the aged and younger people with disabilities or End-Stage Renal Disease. 42 U.S.C. §1395 *et seq.* It has four parts: A, B, C, and D. *Id.* Part A pays for inpatient hospital services. 42 U.S.C. §§1395c – 1395i-6. Part B pays for physician services and other outpatient items and services, 42 U.S.C. §§ 1395j – 1395w-6. Part C is the Medicare Advantage (MA) program, which provides health coverage through private insurers. 42 U.S.C. §§ 1395w-21 – 1395w-29. Part D provides for voluntary prescription drug coverage through private insurers. 42 U.S.C. §§ 1395w-101 – 1395w-154.

20. This action involves Medicare Part B. The Secretary administers Medicare Part B through CMS and its MACs, which process and pay Part B claims (that is, provider requests for payment) for specific geographic regions. 42 C.F.R. § 421.400; 42 C.F.R. § 421.404(b)(1). The

MACs review the claims, along with any supporting documentation and billing and coding information, to determine whether the physician services are reasonable and necessary and therefore reimbursable under Medicare Part B pursuant to 42 U.S.C. § 1395y.  42 C.F.R. § 424.5(a)(6). The MAC for New York is NGS.

21. CMS may issue National Coverage Determinations (NCDs) finding that certain services, including physician services, are reasonable and necessary. 42 U.S.C. § 1395y(l)(6)(A). If there is no NCD, then the MAC may issue a Local Coverage Determination (LCD) that sets forth requirements for a particular service to be reasonable and necessary in the geographic area administered by the MAC. 42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(1). Alternatively, the MAC may determine that services are reasonable and necessary on a claim-by-claim basis.

22. CMS has not issued an NCD on PBT. 42 CFR § 512.240. But some MACs, including NGS, have issued LCDs concluding that PBT is a reasonable and necessary physician service that is reimbursable under Medicare Part B. *Proton Beam Therapy (L35075),* National Government Services (2019).

### NGS determined the Medicare rates for PBT in Manhattan without following a statutory, regulatory, or sub-regulatory methodology for setting rates

23. Congress prescribed the Part B methodology that the Secretary and, by extension, CMS must use to determine the rates paid for PBT furnished by NYPC.

24. The payments are to be the lesser of: (1) the actual charge for the service; or (2) the amount "determined under" the Medicare Physician Fee Schedule (MPFS), also known as the "fee schedule amount."  Any payments at amounts "determined under" the MPFS must be equal to the product of the RVUs for the service, the conversion factor, and the geographic adjustment factor for the fee schedule area. 42 U.S.C. §§ 1394w-4(a)(1), (b)(1); 42 C.F.R. § 414.20, *et seq.*

25. By statute, CMS must "produce a single relative value" for each service. The statute does not authorize CMS to produce multiple different relative values for a particular service depending on the locality where the service is furnished.

26. By statute, the relative value of a service is calculated using work, practice expense, and malpractice components, all measured by RVUs. The work component refers to "the resources used in furnishing the service that reflects physician time and intensity in furnishing the service." The practice expense component reflects general categories of expenses, "such as office rent and wages of personnel." The malpractice component reflects malpractice expenses used in furnishing the service.  42 U.S.C. §§ 1395w-4(c)(1)(A)-(C); 42 C.F.R. § 414.22.

27. "The Secretary, not less often than every 5 years, shall review the [single] relative values established … for all physicians' services[,]" including PBT. 42 U.S.C. § 13951-4(c)(2)(B)(i). "The Secretary shall, to the extent the Secretary determines to be necessary … adjust the number of such units to take into account changes in medical practice, coding changes, new data on relative value components, or the addition of new procedures.  The Secretary shall publish an explanation of the basis for such adjustments."  42 U.S.C. § 13951-4(c)(2)(B)(ii)(I).

28. There are statutory exceptions to this methodology. But none of them authorize the establishment of local relative values or even apply to PBT. 42 U.S.C. § 1395w-4(b)(2).

29. Congress did authorize CMS to establish "ancillary policies … as may be necessary to implement" the MPFS.   But that authority is available only *after* CMS has developed "a single relative value" for the service. 42 U.S.C. 1395w-4(a)(4).

30. Notwithstanding the plain language of the statute, CMS has stated in a voluminous sub-regulatory guidance document called the Medicare Claims Processing Manual (MCPM) that if CMS has not established national RVUs for services under the MPFS, then the MAC "must

establish local relative values (to be multiplied…by the national [conversion factor]), as appropriate or establish a flat local payment amount." MCPM, Ch. 12, Sec. 20.2.  Again, Congress did not authorize CMS to determine local relative values, or otherwise establish a flat local payment amount, much less deputize the MACs to do the same thing.

31. In the MCPM, CMS departs from the statute and its implementing regulation by instructing NGS and other MACs to begin any determination of a Medicare rate for a Current Procedural Terminology (CPT) code for a locality by first determining the local RVUs for the code.  NGS is then supposed to multiply the local RVUs by the national conversion factor to determine the Medicare rate for the locality, without applying a geographic conversion factor.

32. CMS presumably directed NGS to calculate the Medicare rate without applying the geographic conversion factor required by the statute and its implementing regulation because CMS told NGS in the MCPM that NGS "must establish local relative values."  That is, CMS told NGS in the MCPM to calculate RVUs based on the costs of the locality where the services are furnished, and so there is no "single relative value" against which NGS can or should apply a geographic conversion factor.  CMS localized and then truncated the statutory methodology.

33. Importantly, neither the statute, nor its implementing regulation, nor the MCPM authorizes or instructs NGS or any other MAC to take a RVU from one locality, apply a geographic conversion factor (or other modifier), and then apply the result to another locality.  Such *ad hoc* modifications of local RVUs are not contemplated anywhere and are simply lawless.

34. CMS and NGS must determine Medicare rates for at least two CPT codes that NYPC uses to bill for PBT: 77523 (proton treatment delivery; intermediate) and 77525 (proton treatment delivery; complex). If NGS had followed the MCPM, then NGS would necessarily have determined local RVUs for each code *using only NYPC's actual work resources, practice*

*expenses, and malpractice expenses.* This is because NYPC is the only provider of PBT in Manhattan, and Manhattan is a unique locality. The work resources, practice expenses, and malpractice expenses associated with furnishing PBT in Manhattan are radically different from everywhere else in the country, including New Jersey.

35. NGS has not determined local RVUs for CPT codes 77523 or 77525. Instead, NGS has determined the rate paid to NYPC for each CPT code using its own *ad hoc* methodology.

36. NYPC knows that NGS did not follow the statute, implementing regulations, or MCPM to calculate rates for PBT furnished in Manhattan for four reasons. <u>First</u>, CMS acknowledged in a recent rulemaking that CMS and the MACs did not follow the statute. *See Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment and Coverage Policies; Medicare Shared Savings Program Requirements; and Medicare Prescription Drug Inflation Rebate Program*, 90 Fed. Reg. 32,352, 32,430 - 32,431 (Jul. 16, 2025). <u>Second</u>, NGS previously indicated in emails to NYPC that NGS had no intention of using expense information from NYPC to determine local RVUs for PBT furnished in Manhattan. Email from Greg McKinney, MD, MBA, Chief Medical Officer of NGS to Curtis W. Lord, (December 14, 2020, 6:41 AM EST) (attached as Exhibit 1); *see also* Email from Greg McKinney, MD, MBA, Chief Medical Officer of NGS to Curtis W. Lord, (December 28, 2020, 12:29 PM EST) (attached as Exhibit 2). <u>*Third*</u>, NGS previously stated on its website that it has not determined local RVUs for PBT for Manhattan. *Fee Schedule Lookup*, National Government Services, https://tinyurl.com/2p9eh6ux (last visited June 12, 2024) (results attached as Exhibit 3 and 4). <u>*Fourth*</u>, NGS testified on February 6, 2024, that it has always used an entirely different methodology. Dr. Stephen Boren, a Medical Director for NGS, gave the testimony during an ALJ

hearing. The hearing was for a separate matter involving NYPC and NGS. Dec. of B. Stimson, Tab 1 (hearing transcript), p. 1 (attached as Exhibit 5).

37. Dr. Boren testified that the NGS payment methodology for PBT traces back to October 2010, when another MAC named WPS developed local RVUs for codes 77523 and 77525 for a proton beam center in Warrenville, Illinois. *Id.* at pp. 17-18. WPS used the local RVUs for Warrenville to set rates for the codes billed in that locality. *Id.* Years later, NGS succeeded WPS as the MAC for Illinois. *Id.* at p. 18. NGS converted the Warrenville local RVUs to the Manhattan locality by applying the geographical pricing cost index (GPCI) to the local RVUs for Warrenville. *Id.* NGS then used the local RVUs for Manhattan to set rates for Manhattan. *Id.*

38. Dr. Boren admitted that the NGS website does not state how NGS calculates rates for PBT or identify single or local RVUs for PBT. *Id.* at pp. 19-20. He nevertheless posited that "everyone … in the proton beam field understands that contractors price their proton beam pricings with RVUs" because the Medicare fee schedule is public. *Id.* at p. 20. This was news to NYPC, which had sought but never received an explanation of the pricing methodology from NGS.

39. Dr. Boren was unequivocal that NGS has always applied the same *ad hoc* methodology to determine local RVUs and rates for PBT furnished in Manhattan:

> Q:    Hey Dr. Boren. I want to clarify my understanding of what you testified to, which is that NGS took RVUs that were developed in Illinois and applied GPCIs to those RVUs to determine the rates that it paid to New York Proton and then published those rates, but not the underlying methodology, in the fee schedule. Is that accurate?
>
> A:    Yes. Yes, sir. It is accurate and standard.
>
> Q:    And NGS has applied that methodology to all the claims that are in dispute in this particular appeal, correct?
>
> A:    We've applied that method to all our localities, whether or not they have proton beam facilities or not.
>
> …

Q:     That would include the only locality in the state of New York, which is NYP[C], correct?

A:     That is correct.

Q:     And NGS has always applied that methodology to all of its localities, including NYP[C], correct?

A:     Yes.

*Id*. at pp. 21-22.

40. Dr. Boren thus confirmed NGS has never applied the statutory methodology to a "single relative value" to determine the Medicare rates for PBT furnished in Manhattan. CMS has not established the Warrenville, Illinois RVUs as the national "single relative value" for PBT services payable under the MPFS. Nor has NGS ever followed the MCPM and applied the national conversion factor to local RVUs for Manhattan, or "establish[ed] a flat local amount." NGS has always taken the local RVUs for Warrenville, Illinois and multiplied them by the GPCI to determine local RVUs and rates for Manhattan.

41. If NGS had used expense information from NYPC to determine local RVUs under the sub-regulatory methodology set forth in the MCPM, then the Medicare rates payable to NYPC would have been like the rates calculated by the economics consulting firm Dobson DaVanzo & Associates LLC (Dobson | DaVanzo), which NYPC commissioned to calculate local RVUs and Medicare rates for CPT codes 77523 and 77525 for Manhattan.  Dobson | DaVanzo reported that the rates that NGS determined for NYPC were more than 60% lower than the rates calculated by Dobson | DaVanzo. NYPC has repeatedly given its actual expenses and Dobson | DaVanzo's findings to NGS, CMS, and HHS, to no avail.  They are a part of the administrative record for this case.

42. The rates determined by NGS are outliers. They are lower than the rates Medicare pays

for the same services to be furnished in a hospital outpatient department.  And they are lower than the rates that Novitas (another MAC) determined for the same services provided to beneficiaries in for rural and suburban Somerset County, New Jersey:

| PBT Code | Dobson \| DaVanzo[1] | Hospital Outpatient Rate[2] | Novitas NJ Rate[3] | NGS NY Rate |
|---|---|---|---|---|
| 77523 (Proton treatment delivery; intermediate) | $2,055.61 | $2,452.67 | $1,155.64 | $1,097.00 |
| 77525 (Proton treatment delivery; complex) | $2,702.05 | $2,523.64 | $1,304.84 | $1,167.97 |

These material differences are not the product of rounding errors. They are the direct result of NGS departing from both the law and the MCPM.

### *CMS has underpaid NYPC to the point of jeopardizing access to PBT*

43. The first group of Medicare payment determinations involve PBT furnished to Medicare beneficiaries in Manhattan from October 7, 2021, up through June 13, 2022. The Medicare beneficiaries included Ms. Heineman, who received PBT on June 2-3, 6-10, and 13, 2022; Mrs. Lynch, who received PBT on May 31, and June 1-3, 6-10, and 13, 2022; and Mr.

---

[1] The Dobson | DaVanzo payment rates were based on the Conversion Factor in effect for services furnished during Calendar Year 2019 and incorporated a GPCI adjustment. The Dobson | DaVanzo rates included in this table incorporate the Conversion Factor in effect for services furnished during Calendar Year 2022 and remove the GPCI.

[2] The Hospital Outpatient Rate includes the facility fee paid through the Hospital Outpatient Prospective Payment System (OPPS) and the facility professional fee paid under the Medicare fee schedule for PBT provided in a hospital outpatient setting. Here, the OPPS payment of $1,355.67 was calculated using the Calendar Year 2022 relative weight of APC 5625 (the APC to which CPT codes 77523 and 77525 were assigned) and the wage-adjusted OPPS conversion factor. Medicare fee schedule payments of $1,097.00 and $1,167.97 were calculated using the NGS local "Fee Schedule Lookup" for CPT codes 97523 and 97525 for 2022, respectively. The combined OPPS and Medicare fee schedule payment rates if NYPC had furnished its services in a hospital outpatient department—instead of at NYPC—would have been $2,452.67 ($1,355.67 + $1,097.00) and $2,523.64 ($1,355.67 + $1,167.97).

[3] Effective for calendar year 2022.

Petersen, who received PBT on May 9, 11-13, 16-20, 23-27, and 31, and June 1, 2022. NYPC billed a total of 1,078 claims for the PBT. CMS underpaid the claims by more than $1 million.

44. The second group of Medicare payment determinations involve PBT furnished to Medicare beneficiaries in Manhattan. The Medicare beneficiaries did not include Ms. Heineman, Mrs. Lynch, or Mr. Petersen. On this group, CMS underpaid NYPC by $883,429.19.

45. The Medicare payments did not cover the costs that NYPC incurred to furnish the PBT to the Medicare beneficiaries.

46. CMS would have paid substantially more—and covered the costs that NYPC incurred to furnish the PBT to the Medicare beneficiaries—had NGS calculated rates such as the ones developed by Dobson | DaVanzo for NYPC, CMS for hospital outpatient clinics, or even Novitas for New Jersey:

| | Dobson \| DaVanzo Rates | Hospital Outpatient Setting Rates | Novitas (NJ) Rates | NGS (NY) Rates |
|---|---|---|---|---|
| Additional Payment for 77523 | $958.61 | $1,355.67 | $58.64 | $00.00 |
| Additional Payment for 77525 | $1,534.08 | $1,355.67 | $136.87 | $00.00 |

47. The delivery of high-value PBT to Medicare beneficiaries in Manhattan at current rates is financially unsustainable.  It does not make rational economic sense for NYPC to furnish PBT without covering the costs of providing the treatment. NYPC must receive Medicare rates sufficient to cover the costs of providing the treatment or stop furnishing PBT to Medicare beneficiaries. Otherwise, NYPC will jeopardize its financial ability to treat other patients.

48. NYPC wants to treat Medicare beneficiaries because they benefit tremendously from PBT, and NYPC cares deeply about their health. It is disappointing that CMS has put the treatment

of Medicare beneficiaries in New York State in jeopardy by allowing NGS to use an unlawful

methodology to pay unlawful and irrationally low Medicare rates for PBT.

## SUBJECT MATTER JURISDICTION

49. The Medicare statutes and regulations create a process by which providers may appeal

initial determinations on Part B claims. 42 U.S.C. § 1395ii; 42 U.S.C. §§ 405(g), (h); 42 U.S.C. §

1395ff; 42 C.F.R. part 405, subpart I.

50. An initial determination includes any issue "having a present or potential effect on the

amount of benefits to be paid under … Part B … including a determination as to whether there

was an underpayment of benefits paid under … Part B, and if so, the amount thereof."  42 C.F.R.

§ 405.924(b)(11). An initial determination excludes "[a]ny issue regarding *the computation* of the

payment amount of program reimbursement *of general applicability* for which CMS or a carrier

has *sole responsibility under Part B* such as the establishment of a fee schedule … ."  42 C.F.R. §

405.926(c) (emphasis added).

51. The administrative appeal of an initial determination may involve a request for

redetermination to the MAC, a request for reconsideration to the QIC, an appeal to an ALJ, and

review by the Medicare Appeals Council. 42 C.F.R. §§ 405.940 – 405.958 (MAC

redeterminations), 405.960 – 405.978 (QIC reconsiderations), 405.100 – 405.1058 (ALJ

decisions), 405.1100 – 405.1140 (Council review).

52. Section 405(g) provides for judicial review.  "This provision . . . contains two separate

elements: first a jurisdictional requirement that claims be presented to the agency, and second, a

waivable requirement that the administrative remedies prescribed by the Secretary be exhausted."

*Smith v. Berryhill*, 587 U.S. 471, 478 (2019) (cleaned up). "[E]xhaustion of those steps may not

only be waived by the agency but also excused by the courts." *Id.* (same).The law does "not make

exhaustion a pure necessity, indicating instead that while [the Secretary] is empowered to define the steps claimants must generally take, [the Secretary] is not also the unreviewable arbiter of whether a claimant has sufficiently complied with those steps." *Id.* at 484.

### *This Court should  exercise subject matter jurisdiction over the first group of Medicare payment determinations*

53. The first group of Medicare payment determinations here are appealable initial determinations. They all have "a present or potential effect on the amount of benefits to be paid under … Part B" and thus fall squarely within the regulatory list of determinations that are appealable initial determinations.  At the same time, not one of the payment determinations is a "computation of the payment amount of program reimbursement of general applicability" because not one of them is a lawful computation methodology generally applicable across the Medicare program. NYPC appealed the determinations on the ground that NGS used an unlawful computation methodology and not because NYPC believes that there was a computation error.

54. What is more, no computation here could have been a "computation of the payment amount of program reimbursement of general applicability" *because any computations applied only to NYPC as the sole provider of PBT in Manhattan*.

55. For this reason, NYPC requested a redetermination from NGS, which NGS dismissed. A copy of the NGS dismissal is attached as Exhibit 6.

56. NYPC then requested a reconsideration of the NGS dismissal by the QIC, which the QIC dismissed.  A copy of the QIC dismissal is attached as Exhibit 7.

57. NYPC then requested ALJ review of the QIC dismissal. The ALJ affirmed the QIC dismissal on the purely legal ground that the Medicare payment determinations were not appealable initial determinations:

42 C.F.R. § 405.926, entitled "Actions that are not initial determinations," states: "Actions that are not initial determinations and are not appealable under this subpart include, but are not limited to the following: Any issue regarding the computation of the payment amount of program reimbursement of general applicability for which CMS or a carrier has sole responsibility under Part B such as establishment of a fee schedule set forth in part 14 of this chapter, or an inherent reasonableness adjustment pursuant to § 405.502(g)."

…

In its ALJ request, the Appellant stated: "Because NGS failed to follow the established computation methodology of general applicability and that failure resulted in an underpayment … this appeal is permitted under CMS regulations." (File 1, p. 7). The ALJ finds that the Appellant's ALJ request fall[s] within the parameters of "any issue regarding the computation of the payment amount of program reimbursement of general applicability … ." (Emphasis added.) *See* 42 C.F.R. § 405.926.

For the reasons discussed above, I AFFIRM the dismissal of the reconsideration request.

Pursuant to 42 C.F.R. § 405.1048(b), this determination is binding on all parties unless the decision is reopened and revised by the ALJ or attorney adjudicator under the procedures in § 405.980.

Decision Affirming Dismissal, OMHA Appeal No. 3-12041675156 (May 30, 2023) (attached as Exhibit 8). The ALJ thus found—without reviewing any record evidence—that NGS's determination of the rate for PBT was a "computation of the payment amount of program reimbursement of general applicability" under 42 C.F.R. § 405.926(c).

58. The dismissal of the request for ALJ review was binding and not subject to review unless it was vacated by the ALJ for "good and sufficient cause" shown. 42 C.F.R. §§ 405.1052(e), 405.1054(b). *Unless the dismissal was vacated, it was "not subject to further review" by the Council. Id.* (emphasis added).

59. NYPC could not possibly show good cause because the good cause standard is an evidentiary and not a legal one. Good cause means that "(1) [t]here is new and material evidence that – (i) [w]as not available or known at the time of the determination or decision; and (ii) [m]ay

18

result in a different conclusion; or (2) [t]he evidence that was considered in making the determination or decision clearly shows on its face that an obvious error was made at the time of the determination or decision." 42 C.F.R. §§ 405.986(a)(1), (2). The ALJ found that the determination by NGS was not an appealable initial determination; the ALJ's dismissal was grounded in a legal conclusion, not an evidentiary conclusion, which made continued pursuit of the administrative process the equivalent of no review at all for Plaintiffs.

60. NYPC nonetheless filed a request with the ALJ, pursuant to § 405.1052(e), for a vacatur of the order affirming the QIC dismissal. A copy of that motion is attached as Exhibit 8. The ALJ erroneously construed the request as one to reopen the proceedings pursuant to § 405.980(a)(1). In any event, the ALJ found no good cause under §§ 405.986(a)(1) or (2). A copy of the ALJ's order denying the request for a vacatur is attached as Exhibit 9.

61. The Court must waive administrative exhaustion because the denial of the request for a vacatur left Plaintiffs without a pathway for further administrative and judicial review of the first group of Medicare payment determinations under the Medicare Act. Further resort to the administrative process would mean no review at all for Plaintiffs. The only available pathway for judicial review now is this action under the APA, pursuant to this Court's subject matter jurisdiction over federal questions under 28 U.S.C. § 1331.

### *This Court should exercise subject matter jurisdiction over the second group of Medicare payment determinations*

62. The second group of Medicare payment determinations here are appealable initial determinations, just like the first group of Medicare payment determinations.

63. For this reason, NYPC requested a redetermination from NGS, which was unfavorable. A copy of the NGS redetermination is attached as Exhibit 10.

64. NYPC then requested a reconsideration of the NGS redetermination by the QIC, which was unfavorable.  A copy of the QIC reconsideration is attached as Exhibit 11.

65. NYPC then requested an ALJ hearing. On August 13, 2025, the ALJ dismissed the request on the purely legal ground that the Medicare payment determinations were not appealable initial determinations. Notice of Dismissal, OMHA Appeal No. 3-15231653695 (Aug. 13, 2025) (attached as Exhibit 12).  The Notice of Dismissal stated the "dismissal is binding unless it is vacated by the . . . Council, *or* by the [ALJ] who issued the dismissal." *Id*. (emphasis added). The Notice further stated "you may file an appeal with the . . .  Council[,] . . . [y]ou *also* have the right to request that the [ALJ] who issued the dismissal vacate the dismissal[,] and [f]iling a request with the [ALJ] . . . does not extend the 60-day period . . . for filing an appeal of the dismissal with the . . . Council." *Id*. (emphasis added). The Notice of Dismissal did not state that the remedies available through the ALJ and the Council were mutually exclusive. Nor did the Notice of Dismissal state that the 60-day period for a request to the Council applied to any request to the ALJ. Nor did the Notice of Dismissal state that an untimely request to the Council would moot a timely request to the ALJ. Indeed, the Notice of Dismissal suggested the opposite.

66. On October 17, 2025, NYPC mailed the ALJ a request to vacate the ALJ order dismissing the hearing request pursuant to § 405.1052(e).[4] A copy is attached as Exhibit 13.

67. On October 20, 2025, NYPC sent the Council a request to vacate the ALJ order dismissing the hearing request, as well as the ALJ's forthcoming order on NYPC's request to the ALJ to vacate the same, to fully preserve NYPC's rights to administrative and judicial review.

---

[4] Section 405.1052(e) states that "[i]f good and sufficient cause is established, the ALJ . . . may vacate his or her dismissal of a request for hearing or review within 180 calendar days of the date of the notice of dismissal." This regulation does not require the appellant to submit the request to vacate the dismissal by a specific date within the 180-day period.

NYPC sent the request to the Council through the Council's online portal. A record of the submission through the online portal is attached as Exhibit 14.

68. On October 31, 2025, the Council dismissed the request to the Council as untimely and found "[t]he ALJ's action is binding," notwithstanding the pending, timely request to the ALJ to vacate the ALJ's action. The Council reasoned that the filing deadline for any request to the Council was Friday, October 17, 2025, NYPC submitted the request to the Council through the online portal on Monday, October 20, 2025, and the Council received the request on October 20, one business day after the filing deadline. Notice of Order of Dismissal by Medicare Appeals Council, Docket No. M-26-225 (Oct. 31, 2025) (attached as Exhibit 15). The Order of Dismissal was a final decision by the Secretary and, by the extension, a final agency action.

69. This final decision was legally erroneous and unsupported by substantial evidence. It was also arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law. Nothing in the Medicare statutes or regulations or the Notice of Dismissal authorized the Council to find the ALJ's action was binding notwithstanding NYPC's pending, timely request to the ALJ to vacate the very same action. Indeed, the Notice of Dismissal suggested to NYPC that the ALJ would adjudicate NYPC's request to the ALJ without regard to any alleged infirmity with NYPC's subsequent request to the Council. Here, the Council received the request from NYPC one business day after the filing deadline calculated by the Council. NYPC complied or substantially complied with the Council's filing deadline. The Council was not prejudiced by the alleged untimely filing. For these and other reasons, this Court should vacate the final decision.

70. Alternatively, this Court should find the Council's filing deadline was equitably tolled under these extraordinary circumstances and vacate the final decision by the Secretary.

71. There is no jurisdictional bar to this Court reaching the merits of NYPC's claim for judicial review of the second group of Medicare payment determinations. The second group presents the same merits issues as the first group. No principle of administrative law counsels in favor of a remand of the second group back to the Secretary while this Court reaches the merits issues for the first group. This Court should exercise subject matter jurisdiction over the second group and reach the merits of all NYPC's claims in one fell swoop.

72. Alternatively, this Court should stay NYPC's claim regarding the second group pending this Court's adjudication of NYPC's claim regarding the first group.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Administrative Procedure Act
### (Final Agency Action not in Accordance with Law)

73. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

74. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

75. NGS had to follow the statute and its implementing regulations when determining Medicare rates for PBT.

76. NGS did not follow the statute and its implementing regulations. Instead, NGS used its own *ad hoc* methodology to determine the rates.

77. The Medicare payment determinations incorporate the Medicare rates for PBT that NGS determined using its *ad hoc* methodology.

78. The Court should accordingly vacate and set aside the Medicare payment determinations under 5 U.S.C. §§ 706(2)(A) and (C).

**Count II**
**Violation of the Administrative Procedure Act**
**(Failure to Follow Self-Adopted Rule)**

79. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

80. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

81. Alternatively, and to the extent that Section 20.2 of Chapter 12 of the MCPM is somehow in accordance with the statute and its implementing regulations, NGS acted on behalf of CMS and therefore had to follow Section 20.2 when determining Medicare rates for PBT in these initial determinations.

82. NGS did not follow Section 20.2.  Instead, NGS used its own *ad hoc* methodology to determine the rates.

83. The Court should accordingly vacate and set aside the Medicare payment determinations under 5 U.S.C. §§ 706(2)(A) and (C).

**Count III**
**Violation of the Administrative Procedure Act**
**(Final Agency Action Without Observance of Procedure Required by Law)**

84. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

85. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

86. Under the statutory methodology, "[t]he Secretary, not less often than every 5 years, shall review the [single] relative values established … for all physicians' services[,]" including PBT. 42 U.S.C. § 13951-4(c)(2)(B)(i). "The Secretary shall, to the extent the Secretary determines

to be necessary … adjust the number of such units to take into account changes in medical practice, coding changes, new data on relative value components, or the addition of new procedures. The Secretary shall publish an explanation of the basis for such adjustments." 42 U.S.C. § 13951-4(c)(2)(B)(ii)(I). The Secretary did not meet those procedural requirements for—or give a reasoned explanation for declining to adjust—any single relative values for PBT. Thus, the initial determinations were reached without observance of the underlying procedure required by law.

87. The Court should accordingly vacate and set aside the Medicare payment determinations under 5 U.S.C. §§ 706(2)(A), (C), and (D).

**Count IV**
**Violation of the Administrative Procedure Act**
**(Final Agency Action Without Observance of Procedure Required by Law)**

88. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

89. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

90. Alternatively, and the extent Section 20.2 of Chapter 12 of the MCPM is somehow in accordance with the statute and its implementing regulations, Section 20.2 is a rule or statement of policy that "establishes or changes a substantive legal standard governing … the payment for services" under 42 U.S.C. § 1395hh(a)(2).

91. Section 20.2 had to be published through notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2). It was not. As a result, NYPC Plaintiffs did not receive fair notice or any opportunity to comment on the methodology before it became effective. *Azar v. Allina Health Services*, 139 S.Ct. 1804, 1814 (2019). Section 20.2 of Chapter 12 of the MCPM was ineffective to the extent that NGS and CMS applied it against Plaintiffs.

92. The Court should vacate and set aside the Medicare payment determinations and Section 20.2 of Chapter 12 of the MCPM under 5 U.S.C. §§ 706(2)(A), (C), and (D).

## Count V
### Violation of the Administrative Procedure Act
### (Final Agency Action Without Observance of Procedure Required by Law)

93. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

94. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

95. The *ad hoc* NGS methodology for determining the Medicare rate for PBT in Manhattan is a rule or policy that "establishes or changes a substantive legal standard governing … the payment for services" under the Medicare Act, 42 U.S.C. § 1395hh(a)(2).

96. To the extent that the *ad hoc* NGS methodology is somehow in accordance with the statute, it still had to be published through notice-and-comment rulemaking.  42 U.S.C. § 1395hh(a)(2). It was not. As a result, Plaintiffs did not receive fair notice or any opportunity to comment on the methodology before it became effective. *Azar v. Allina Health Services*, 139 S.Ct. 1804, 1814 (2019). The *ad hoc* NGS methodology was ineffective when NGS and CMS applied it against Plaintiffs.

97. The Court should vacate and set aside the Medicare payment determinations and the *ad hoc* NGS methodology under 5 U.S.C. §§ 706(2)(A), (C), and (D).

## Count VI
### Violation of the Administrative Procedure Act
### (Arbitrary and Capricious Final Agency Action)

98. Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

99. All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

100.    The Medicare payment determinations are arbitrary and capricious for numerous reasons, including but not limited to:

- They defeat the purposes of the Medicare program because they do not cover the costs of delivering PBT in Manhattan;

- They pay rates for PBT that are below what CMS pays hospitals and what other MACs pay physicians in localities with materially lower work, practice, and malpractice expenses relative to Manhattan;

- Neither CMS nor NGS has disclosed through notice-and-comment rulemaking or another proper procedure how NGS determined the rates; and

- Neither CMS nor NGS has explained why the rates are supposedly rational.

101.    The Court should therefore vacate and set aside the Medicare payment determinations under 5 U.S.C. § 706(2)(A).

**Count VII**
**Violation of the Administrative Procedure Act**
**(Final Agency Action Unsupported by Substantial Evidence)**

102.    Plaintiffs incorporate the allegations in paragraphs 1 through 72 above as if set forth herein.

103.    All Medicare payment determinations here are initial determinations, and final agency actions, which are reviewable under the APA.

104.    Alternatively, and the extent Section 20.2 of Chapter 12 of the MCPM is somehow in accordance with the statute and its implementing regulations, and to the extent the Medicare payment determinations were reached using Section 20.2, the Medicare payment determinations are unsupported by substantial evidence.  NGS did not use NYPC's actual expenses to determine the rates payable to NYPC for PBT furnished in Manhattan.  NYPC is the only provider of PBT

in the locality of Manhattan and, under Section 20.2, any determination of the rates payable to NYPC for PBT furnished in Manhattan must consider the actual expenses incurred by NYPC.

105.    The Court should therefore vacate and set aside the Medicare payment determinations under 5 U.S.C. § 706(2)(E).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

a.    Vacate and set aside all Medicare payment determinations under 5 U.S.C. §§ 706(2)(A), (C), (D), and (E);

b.    Vacate and set aside the ad hoc NGS methodology, and Section 20.2 of Chapter 12 of the MCPM, under 5 U.S.C. §§ 706(A), (C), and (D);

b.    Remand the case to the Secretary to redetermine the Medicare payment determinations consistent with law;

c.    Award plaintiffs' attorney fees and costs; and

d.    Award plaintiffs such other and further relief as the Court may deem just and proper.

Date: December 30, 2025                              Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

/s/ *Brian R. Stimson*
Brian R. Stimson
D.C. Bar No. 1657563
2100 Pennsylvania Ave., NW Suite 350S
Washington, DC 20037
(202) 677-4948
brian.stimson@agg.com

*Attorney for Plaintiffs*

MCDERMOTT WILL & SCHULTE LLP

/s/ *Steven Schnelle*
Steven Schnelle
N.Y. Bar No. 5496492
One Vanderbilt Ave.
New York, NY 10017-3852
(212) 547-5403
sschnelle@mwe.com

*Pro Hac Vice Forthcoming*


ABELL ESKEW LANDAU LLP

/s/ *Scott Landau*
Scott Landau
N.Y. Bar. No. 4136388
488 Madison Ave., 23rd Floor
New York, NY 10022
(646) 970-7343
slandau@aellaw.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff The New York Proton Center*